Next case, this morning is Adcock v. City of O'Fallon, 516-0435. Excuse me. May it please the court, Penny Livingston for the plaintiffs, Lynn and Lucy Adcock. This is our second time in appellate court. This case is 11 years old. We've been trying to solve flooding for 11 years. One would think we would have obtained an injunction by now. The Adcocks have a clearly ascertainable right to not flood, to not be victims of nuisance. They have clearly been irreparably harmed. Testimony was that flooding interferes with the quiet enjoyment of their property. We have photos, we have videos, testimony. Five engineers testified. This court already decided this case. The findings of fact are very clear, and in those findings of fact, what is very clear is that H&L violated the ordinance that was passed for it to have its subdivision, in that the fence line on the berm, which is 1,000 feet long and holds a lot of water, was undulating. It was not even, and the low spots were flooding. Finally, we got a video of it one day in the middle of the case, and we could show, look where the water really is coming from, since that was such a controversy during the motion to dismiss, after motion to dismiss, after motion to dismiss. The defendant here argues that, oh, well, when they settled with H&L, they got their adequate remedy of law because, you know, they got this $250,000. That's what 11 years of litigation costs you when you've been to the appellate court and got hearing after hearing after hearing, including contempt hearing after contempt hearing after contempt hearing. It was very clear that H&L was not going to have the resources to perform the injunctive relief. But what was also clear by that time is that if you raised the berm so that the low spots would not allow the flooding of this 1,000-foot-long detention basin, you would flood all the condo owners. That is not the intent of my client, to flood other people, to solve the flooding that occurs on his property. The city says, oh, you know, when we balance the equities here, it's unfair to ask the city to spend all this money to solve the problem of one taxpayer. The whole neighborhood floods. Is it fair to put the burden of fixing the city's road that doesn't work right on one taxpayer who floods, and also the whole neighborhood floods? So in a balancing of the equities, they like to say, well, my client's property isn't worthwhile or something. It is not fair for a city to take a roadway from a developer where the roadway itself is a giant, impervious surface, and where does the water from the roadway go? Well, it backs into a puddle that is inadequately sized. It doesn't have a good green. But the reality is that that 1,000 feet of water, I don't remember, 30 feet deep, 50 feet wide, it's those people's backyards of the condo, all that water, which we might remember 20 acres of water comes from the Hubbard pond owned by the city. And we had to design this oversized, which that's how they get flood, oversized. If the condo, if the berm goes up, the condo people will be flooded because it's so oversized. Why is it oversized? Because the city isn't dealing with their other water. Then that water comes in. What happens? Well, as the water needs to exit this detention basin during these frequent storm events, it can't because the city's pipe chugs this pipe and won't let the water out. That was the testimony at trial. That was the finding by this court, two members being in this court. Those are the findings. That's the case. And the city would like the court to reconsider how the trial went out. Six days of trial we did. All the testimony's been out. But what happened in the meantime was the judge ordered H&L to implement the remedy. As the case unfolded, it became clear that the only remedy that could be implemented is to resize the pipe and get that pipe to not back into the condo association's basin. You have to get that water out, and it can't be the city keeping that water out. And the city's water needs to go across 52, not chug back into the basin and then over top in the low spots. One of the arguments the city makes is that there is an intervening party diverting water here. There is no intervening party diverting water here. The water from the city's roadway that the city owns and the pipes that the city owns are backing into other pipes that the city owns because they're under the city's street, and they own that street too. And that water is finding its way to the low spots on the berm. What if we could all just raise the berm? And that's why we brought the lawsuit, to raise the berm. And after this many years of litigating and after trial and going through the experts, what did we learn? Well, yeah, the berm's out of compliance, and that was H&L's issue. But really the pipes back up, and that's why it's pushing it into the low spots. And so that the injunctive relief needed here is the city has to fix its pipes. So after we finally got to a settlement, because magically some benefactor gave H&L, Jeff Holland, money to get out of this lawsuit, and since his liability was for attorney's fees, and he'd run them up pretty good in engineering fees, and deposition transcripts, and all of the expenses of litigation, that he could pay for that but not the remedy. Well, considering that the remedy of raising the berm, which he could have easily done for very little money 11 years ago, that was not going to solve the problem. That would flood the condo owners. That's not going to solve the problem. Solves the problem for my client's neighborhood, but that isn't how we do things, and that's not what a court of equity should do. So the only solution can be implemented by the city, and it is the city's roadway that backs into the pipes. So we're now here to ask that the city be ordered, based on the manifest weight of evidence, to perform the injunctive relief. Counsel, would you address the issue of the motion to dismiss, why this court has jurisdiction? All right. So we were in the trial court enforcing against H&L. They did not post a bond, so there was the monetary issue, but there was also the injunctive issue. They were ordered to perform an injunction, and they did not. And it was brought to everyone's attention, frankly, by the city, that the order the judge entered couldn't be implemented anyway because it required additional engineering, and Jeff Holland didn't have any money for additional engineering, and the city wasn't going to pay for it. In fact, you'll note in the briefs that we actually paid their engineer to show up to a meeting so that we could talk about what's the most cost-effective way to do this, including on my client's property for free. We didn't ask for any money. We just want to stop flooding. And so while that was all going on, negotiations were going on, this benefactor showed up, and so as we did the good-faith settlement, it was clear that the injunctive relief would still need to be obtained, and it would need to be obtained by the city. As all of that was going on, the judge said, let's get this out of the way, and then let's have a hearing on what is the remedy for the city. In the meantime, we filed a motion to dismiss in the midst of the case. We didn't appeal that order. We cross-appealed that order when they did to protect our rights because we knew the city's pipes backed up. And that cross-appeal was dismissed? The cross-appeal was dismissed, and it was dismissed almost a year before you had the final order in this case. But actions were being taken by the judge. He was solving the injunctive relief, and when H&L could not perform the injunctive relief, then the issue was we'll have a hearing, and we'll ask that the city do it, and we provided our engineering at that hearing. We also had a cross-appeal against Adina Johnson, which was H&L's attorney, for absolute, outright, outrageous lies that she put in her motion for reconsideration. And really, I loathe to file a motion for sanctions. I believe I've only filed three in 30 years, but that one my clients were pretty mad about, and they didn't want to dismiss against this woman who had lied about them and cost them all of this money. So there was that issue of that state that's still being out there. So when we filed our motion to dismiss our cross-appeal, we stated in that motion, the court is hearing this issue. We're now back doing the very issue that we appealed on to the city, was we think injunctive relief needs to be had against the city. The order was against H&L. We enforced it as far as we could. We couldn't get anywhere. We then settled that, and then we shifted the injunctive relief back to the city, and everyone knew that we were going to dismiss the appeal. There were all these things going on and hearings being held, and we dismissed the appeal. This court dismissed the appeal a year before the judge made his final word. What's your response to the argument that O'Fallon makes about a non-adjacent, dominance-servant state relationship? Right, so the modified spill-the-brew. So we sued H&L under the Adjoining Landowner Act because we were enforcing the old ordinance to say quit flooding us and find the solution here. And we get our attorney's fees and engineering fees under that. We also get injunctive relief under that law. But we sued the city of O'Fallon for common law nuisance because their roadway backs into the detention basin, which then floods the neighborhood, and the roadway is the problem. So we sued them for nuisance. We did not sue them for adjacent landowner violations. We did not sue them under the Adjoining Landowner Act, and we did not sue them under the civil law saying, now mind you, the post-development runoff of the roadway does exceed the pre-development runoff. There was dirt that absorbed water. Now there's an impervious roadway. But we did not sue them for the modified civil rule under dominant and subservient states. And this is not about a subservient state that's refusing to take water from the dominant, and I know you're going to realize this because it's in your opinion, and that is they changed the natural course of water. So the natural course of water has been changed. And when they argue, well, you have to accept it anyway, it's in a pipe. That's not natural. It's not coming at the same frequency. It's not coming to the same location. This is not natural water. Natural water would have gone into the groundwater from the dirt where there's now a roadway. So if you look at our amended complaint, it is completely nuisance from flooding. And anything that is offensive to the census, according to our Supreme Court, is in fact a nuisance. And flooding is clearly offensive to the census. So I don't know if that has answered your question completely. It does. Thank you. Cool. So just to finish that thought also, because the city does say, oh, H&L is this intervening party, in the scheme of here's the roadway, and here's the condo development, and here's the roadway in front of the condo development. Here's the berm. There's the neighborhood and my clients. Yeah, they're not touching. They don't need to touch. They created the nuisance. They're the ones who backed the water in. And they're the only ones who can solve the problem, because raising the berm at this point will not solve the problem. Under the Contribution Act, if I could address that for a minute, I'm sure John will, it talks about the settlement being fair and reasonable in light of the policies of the Act. Of course, the main policy being to encourage tortfeasors to settle with injured plaintiffs. The city likes to talk that they cooperated and worked with people. They never did anything ever, so I don't know. They did, in the last appeal, defend the developer who didn't defend himself, even though they tell this court that they're not really here to fund private parties. It certainly seemed like they could fund him. And they also talk about how it defies logic to conclude that the city or the court thought that liability would magically shift to the city when we settle. It didn't magically shift. It was there all along. This court found that the fact supported nuisance against the city. It merely remanded for the idea of the development of whether or not the city would be immune under government immunity. The city's own case law and the court in its prior order acknowledged that while damages could be subject to government immunity, injunctive relief for a problem you caused is not covered by government immunity. And the damages of $5,000 were stipulated, too. This was always an injunctive relief case for the city to now come and say, oh, they want different and more expansive remedy. No, we want the same remedy. We want to stop flooding from the berm next door. It turns out that it is caused by the pipes chugging. That's what this court found. I believe it's paragraphs 27, 28, 29 of the 2012 opinion. The second policy for the Contribution Act is to encourage equitable apportionment of damages relative to fault. They like to say the city's not at fault here. And the point is, what, the guy who's at fault? Yeah, but what he's at fault for is hiring the incompetent engineer who didn't design this properly. But they took the road. They gladly took the road. They have engineers. They know how to do due diligence. Their own engineer is the one who tells the court in trial, that's Gary Holsher, that this pipe is backing up, that that backwater effect is causing flooding even in the most frequent storms. My clients have been flooding for 11 years nearly every time it rains. It is a travesty of justice that we have been delayed justice, that we have been denied justice, that we are even here again. So I would ask this court to please show the Adcocks and the justice system that we can get justice and that we can solve problems. Clearly, we have shown by manifest weight of evidence that we have proven nuisance. This court has found it before and knows what the facts are. The facts are still the same. The remedy, we never got, so we never had a hearing on what would the remedy be. And by the way, it's not really the plaintiff's obligation to tell the city how to solve its flooding problem that it causes that we proved it causes. It's their problem to do that. But we hired an engineer, spent another $10,000 that will not be reimbursed to my clients since the defendant who can reimburse is out. Why did we do that? Because we really want to know how to solve the problem and we knew that they would not figure out how to do it. And we need the evidence to be in the record. Here is an alternative. Here are three alternatives. Here's where you can put your pipe, but you've got to get that water across 50 and you've got to not chug that huge detention basin. And so I would also ask, given the history of this case and given how antagonistic his honor seemed to be towards this case in every way, we thought we were getting a remedy. We wait a year. How long it took us to get a remedy against H&L, and we wait another year to get a remedy against the city, and it's again denied. I think that it would be most beneficial if this court would actually dictate what remedy is available or that a remedy be given because it will take them another two years to get a remedy. Although I certainly advise them to get different counsel and trial court when they go back. They cannot be without a remedy. They get it every time it rains. It's actually quite ridiculous. So I don't know if you had any other questions. The totality of circumstances and the balancing of the equities, I think, make pretty clear the Adcocks have been trying for a long time to get remedy for their flooding. The cause of the flooding is the city's pipes backing into that detention basin, and we know that, and we need a remedy for it. And we're not out of line, as the defendant has told this court, in arguing that the judge abused his discretion. We clearly need a remedy, and I don't know what else we could possibly prove. He also argues that he didn't have had quick notice of what was going on. This was a pretty intense time. We were working on this case constantly while Mr. Holland was in contempt. As soon as Mr. Holland faced jail, all of a sudden, you know, resources became available to get him out of the case. But the way to get him out of the case was to pay the attorney's fees of the bills that they had run up through 11 years of hard-fought litigation. And at least the Adcocks got that back before he went into bankruptcy, leaving the remedy, of course, for the city. And for the record, you are Penny Livingston for the plaintiff's appellants, correct? Yes. I did say that. Oh, did you? I'm just making sure. I didn't hear you say that. Your last counsel might not have introduced yourself. I mean, two arguments ago. I am. Thank you very much. Anything else? You'll have an opportunity for a rebuttal. I know I'm exhausted. How many different ways can you say, water chugs the pipes? But I think I've said it 50 different ways in the brief, but I'm sure the way you all wrote it in the appellate decision was perfect. Thank you. Counsel for appellate. May it please the court. John Shaberg for the city of Oak Valley. There's obviously a lot going on in this case, but it's fairly simple at its core. The city doesn't own or control the land or the structures that would have to be fixed to remedy this problem. The city does not own or control the pond. The city does not own or control the 24-inch pipe that goes into the 30-inch pipe. The city's land is not adjacent to their property. Where that comes in is all the case law dealing with civil law is adjacent land. But the essence is we don't own or control the land that needs to be fixed to fix their problem. H&L or the Condominium Association owns that land. They've released the Condominium Association for a payment of $250,000. The lay of the land here is basically the city has a boulevard, Cambridge Boulevard. Who do you contend owns the? I'm sorry? Who do you contend owns the actual? You said the land and the pipe. Who do you contend owns the pipe? The 24-inch pipe in the pond is owned by the Condominium Association. That's my understanding. I don't know if there was ever any proof on the record, but the city does not own it. It was built by the developer, H&L, and whether they ceded it to the Condominium Association or not was never placed on the record. So they were basically treated as one entity. H&L, Jeff Holland, the Condominium Association were kind of treated as one entity. When the plaintiffs entered into the settlement with Mr. Holland and H&L, they wrapped all those entities into the parties that were being released. So it's the developer or the owner of the condominium property owns the pond and the 24-inch pipe that runs into the city's pipe. Now the city has this boulevard over here, Cambridge Boulevard, that is not part of the condominium property. It was dedicated to the city by the developer. It has a 30-inch pipe running underneath it that handles all of the stormwater from Cambridge Boulevard. All of the stormwater from all the adjoining properties, all the parking lots, everything, runs into this 30-inch pipe. Before they started building the condominium property, all of the water ran harmlessly down under Route 50. That's exactly how it was intended to do. At some point later, the condominiums were being built. In 2001, the parties entered into a settlement agreement to modify the engineering plans so that the pond was enlarged. I was not involved in the case at the time, as Livingston was. The pond was enlarged from the original design. There were some additional structures built, and there was what they called a trapezoidal weir, so that the water could overflow the dirt end of this pond, and that would go right on to Mr. Epcot's property. They were all aware of that. They had an engineer that approved that, their attorney approved that, and they agreed to it. So then after 2001, the condominium property started to be developed. At that point, they built a pond, and they run a 24-inch pipe from the pond underground, connected up to the city's 30-inch pipe. There's where the problem was. Gary Holscher looked at it when this lawsuit was first filed on behalf of the city, and he said, yeah, there's a problem. And the city said, well, we don't think it's our obligation to fix it, so we're not going to go forward with your engineering plans. Ms. Livingston adopted Mr. Holscher's testimony at the original trial, and then since then she's gotten another engineer who was actually a supervising engineer with Mr. Holscher, who went to a different engineering firm and now disagrees with that original report. But that's all kind of a side issue. The city's water was going under Cambridge Boulevard, down the 30-inch pipe, under Route 50, not even close, 400 feet away from the Epcot's property. They hook up the pond and the 24-inch pipe, and now there's a problem. The problem is that the 30-inch pipe is already carrying all the water it can. The 24-inch pipe wants to go out the 30-inch pipe, and it can't. So a solution that Mr. Holscher and Mr. Martindale both came up with was, the first thing we do is we plug that connection. Well, we can't plug it where the pipes join. We have to plug it back at the pond, because otherwise the condominiums are going to flood, because the streets that are in the condominium are not part of the city's streets. They have drains that drain into the 24-inch pipe. So if you plug it at the connection between the 24 and the 30, you're going to cause all those to back up and flood. So Martindale, who was their latest engineer, came in and said, you have to plug it down at the pond, where it goes into the pond. Gary Holscher had said, I don't know where to plug it. I would have to do some more study to figure that out. So the essence is, the city can't do anything to the 30-inch pipe. Neither Mr. Holscher nor Mr. Martindale say they can do anything with that 30-inch pipe other than disconnect the 24, disconnect the pond and the 24-inch pipe from going into the 30. And then what they're going to do, Holscher and Martindale both had different schemes to some extent. I think Martindale was trying to take a more cost-effective approach. With them, what they do is they take the piping that comes out of the pond, and they run it through a pattern of bends and twists and turns and different pipes. And they were never real clear on how they were going to do that. But they go out the pond from the other side. And some of that even goes across Mr. Epcot's property. And apparently he was willing to let those pipes be either placed on or under his property to solve the problem. But those pipes that they're talking about doing as part of the remedy, come out of the pond and go the other direction. The first thing they do is they terminate the connection to the 24 so it doesn't run into the city's 30-inch pipe. So the city has no way. Our pipe is fine. When they try to run the water out through our pipe, that's where the problem is. We can't do anything about that. The city doesn't own it. The city doesn't control it. And so that's why, you know, the adjacent landowner is kind of the thing where the legal issues require for the analysis to be adjacent properties. In this case, that really doesn't make that much difference because the remedy has nothing to do with our pipe other than don't let their water run into our pipe. So that's the case in its essence. When they plug the 24-inch pipe into the 30-inch pipe, the water essentially runs backwards or uphill. And that's where we say it's diverted by this other party. We don't have control over them diverting our property. If they came in, dug a ditch from one place to another, and the water decided to go that way, I, as the dominant landowner, I have no control over them digging a ditch into my property and running my water their direction. So that's kind of what's happened here. I feel badly for Mr. and Mrs. Adcock. They're nice people. They're minding their own business. But they bought a piece of property in 1988 that was the lowest piece of property in the 80-acre watershed. Somewhere in the 1980s, a railroad removed their railroad embankment that ran through that 80 acres. But the natural flow of the land, and this was all testified throughout, the natural flow of the water from the entire 80 acres is right down to their property. They have the lowest piece of property in that area. So there's very little that could be done. But having the city do some kind of remedial work is not the answer. Neither Mr. Martindale nor Mr. Holter say to do anything through the inch pipe. And that's all the city owns. I took a look again at the order Judge Lopenow entered on the good-faith settlement. And it resolves issues as to H&L. It doesn't resolve issues as to the condominium association. On what do you base your assertion that when there was a good-faith settlement and H&L was settled out of the case, that basically extinguished any cause of action or any problems or any relationship, adversarial relationship with the condominium association? The condominium association was never a party to the lawsuit. So they were not specifically released or dismissed, rather, from the lawsuit. But the release was a release of all claims against all parties that Judge Holland or H&L controlled. And so in the release itself, it says the condominium association is released from all claims. So we have no way of bringing them back into this lawsuit. Now, with that being said, I want to also mention, the Contribution Act doesn't apply to the adjunctive relief in any way, shape, or form. I'm sorry, could you say that again? It says that the Contribution Act does not apply to the adjunctive relief in any way, shape, or form. So, you know, I think the ad cops, to answer, to carry on your question, the ad cops probably could sue the condominium association for adjunctive relief. I think there might be a fight over that, but that's not my fight. The plaintiffs seem to argue that the good-faith settlement suddenly vacates the entire judgment for adjunctive relief against H&L. But, in fact, that judgment was still there. A settlement with a party and a release and dismissal does not void the judgment. It may satisfy the judgment. It may cause the judgment to be dismissed. But that was, there was never, after the settlement with H&L, there was never anything filed by the plaintiffs asking for any additional relief against the city. The April 2014 order and judgment in the city's favor was the one that was standing. And so this is why we, you know, we may call it a surprise or lack of notice or whatever it may be, but there was nothing before the trial court. This court, the 5th District Health Court, had jurisdiction over the case at the time the court heard the evidence from Mr. Martin. At the time the plaintiffs were claiming additional adjunctive relief against the city. There was never anything filed by the plaintiffs asking to modify, reconsider, vacate, or do anything with that 2014 judgment. It was on appeal with this court. And even after the judge heard the evidence, which I objected to, with Mr. Martindale's testimony, about a month or two later, the plaintiffs then voluntarily dismissed their appeal. They never filed anything after that to suggest that the April 2014 judgment was not final at that time or did not become final within 30 days after this court issued its mandate in December 2015. September 2016, Judge Logano enters another judgment. Frankly, I like that judgment better. But I think in terms of honoring the procedure and the jurisdiction of the courts, April 2014 is the one that becomes final when their cross-appeal is dismissed. The September 2016 judgment is basically the one that becomes annullative. It was entered without jurisdiction. So that's the point on that. I really don't, the motion to dismiss, I don't want to make it look like a technicality, but I think there's a fundamental, important issue, procedure here that April 2014, when Judge Logano entered his order requiring H&L to perform an injunctive and to perform a remedial remedy and to pay attorney's fees, that was in line with this court's 2012 appellate decision. He ordered the city to basically verify that H&L was doing the work in compliance with the city ordinance. The plaintiffs then turn around and collect the judgment for a settlement for $250,000 based on H&L's violation of that ordinance. So everything that was done after 2012 was in compliance with this court's original opinion. April 2014 is the final judgment, and at the very least, after this court issued its mandate, that judgment became final. All of the issues were resolved at that point. If you want to carry it to after the defendant H&L was dismissed from the case, all of the issues as to H&L were resolved at that point. The city was the only party. The only issue as to the city was, is injunctive relief proper? That was on appeal before this court. So once the plaintiffs dismissed their cross-appeal, that April 2014 judgment was final. And it does not require the city to do anything, to take any remedial action. Even if the city were to take some remedial action, the most we could do would be plug up that 24-inch pipe right where it connects with our pipe and flood the condominiums and all the properties to the east. With all due respect, the plaintiffs argued that they have no legal remedy, that they have to have an injunction. They did accept $250,000 in satisfaction of their legal remedy for attorney's fees, also in satisfaction for all the injunctive relief against H&L. It's right there in their settlement agreement. This includes all legal and equitable remedies. So they received their remedy in the form of a $250,000 cash payment. As the city's attorney, I thought maybe they would apply some of that money to fixing the property. It all went to attorney's fees and engineers, apparently. I suggested to Judge Lopeno, and this never made it on the record, at the good faith hearing, I said that I don't have an objection to the good faith of the settlement, but I do think the court ought to order that $250,000 to be placed into escrow. Is there no transcript of that hearing? There is none, no. It was just a good faith hearing, so we weren't objecting to the good faith. Judge Lopeno said that would be for another day. But since there was no additional relief asked against the city, I never raised the issue again. I think I've addressed the motion to dismiss. I think I've addressed all the issues. This court is well aware of all the briefs that have been filed, all the motions and appendices, and all those other things. So are there any questions from the panel? No. Thank you, counsel. Thank you. Ms. Butler? The plaintiff is in a situation where they're trying to enforce against H&L, but they protected their rights in a cross appeal, which were twofold and one had nothing to do with the injunctive relief. But it was that the city participated in the injunctive relief. We already had Jeff Collins. We're enforcing it. We're enforcing it. We can't get anywhere. We can't get anywhere. Now we do a good faith settlement. There's a lot of discussions going on in chambers. He's right. And every time anything gets raised, it is known that if there is a settlement here for money, the injunctive relief will be on the back of the city. This is not a surprise. We've been trying to get the city to solve the problem for 11 years because they are the cause of the problem as much as H&L's burden is the cause of the problem. This is not some new surprise. Everybody was under a complete understanding of how this was going to be. And the fact that the judge said, I'm going to hold a hearing as to the remaining issues did put us in a position where it didn't make any sense to go to the appellate court and fight about how we didn't do anything against the city when the judge said, let's hold a hearing since we now know that what I ordered against H&L is not going to work. That order is null and void when it's completely unenforceable. We couldn't get them to do it. They did not do the injunctive relief. He testified ad nauseum, I'm sure those transcripts are in the record, about his financial woes, all self-created, but he had them. And they were believable. He really didn't have the resources. And someone stepped in and rescued him in some small piece of it, which rescued my clients from having spent $250,000 of their hard-earned truck driver money over the course of 11 years of litigation. At least they got that reimbursed. Now we have the real culprit on the line whose pipes are undersized. When he tells you that they don't own the pipe, they do. And if you look at my proposed order in the appendix, I have a proposed order, and in one of the paragraphs I say, plug it at manhole 21. Thank you, Mike Arnold, who was my original engineer, who kept saying to me, pay attention to manhole 21. It's the problem. Manhole 21, I think that street is tightened. My chiropractor is right near here, so I think the street is tightened. It is a city-owned street, too. To say the city doesn't own the streets in the condo, that's ridiculous. And that manhole 21 is on that roadway. So we are saying plug it. And, by the way, I think if we look at the settlement, Goodface Settlement, H&L, completely agreed to cooperate with anything that needed done because we still do need the berm, you know, not to undulate and to be fortified and not to erode. So there's permissions for that. For them to say, oh, well, the city can't do this. The city has eminent domain powers. They can go get easements. You know, the judge ordered H&L to go get easements from private people. Why can't the city be ordered to do that? And if you look at the alternative number two, you'll see where it goes, because it goes on my client's property, and then it goes straight out to 50. There's some tractors in the front there. I just drove by there the other day. But it's a bunch of ditch and weeds that give my clients mosquitoes because water goes there anyway now as an overflow. So they have the powers to do it. And they do own the 30-inch pipe. And it's the 30-inch pipe that's chugging the 24-inch pipe. Okay. Let me separate these pipes. You're claiming the city owns the 30-inch pipe. Are you claiming the city owns the 24-inch pipe? I believe the city owns the 24-inch pipe. And what do you base that on? Well, the fact that they own the roads and the pipe is under the road and the manhole is in the middle of the road. And Sullivan testified that they own the roads. But I didn't go back into the transcript and specifically figure out if he would have had the opinion that he owned the 24-inch pipe because they think that's part of the stormwater appurtenance, but it's under the road. And I raised this issue in my brief that, hey, you know what? It's under the road and they own the roads, so they own the pipe too. That's part of what they own. But whether clip it off at 24, you go and you put concrete, you know, you go and nine-fill a well kind of thing like you do in landfills and close it off. Well, they can open the manhole and do that. Then the issue becomes how do you get their water across 50 instead of coming back in? And if you stop that, that does that. But you still got to convey their water across 50. You've stopped the berm from overflowing from the berm's water. But what do you do with all that city water now? Well, you've got to convey it across. It's just going to find its way there. So, by the way, bringing up the Condo Association. We should have more litigation on this. We've been fighting and fighting just to solve the flooding problem that should have never happened if the city had done their job to begin with, which is their discretion to do things wrong and not back their citizens. But we don't need more litigation. And just to clip that issue, Jeff Holland never transferred the Condo Association over to the condo owners because he still had a condo outfit across the street, and so he hadn't reached the three-fourths of the buildings that could be sold to turn it over or whatever it was. The Condo Association is not someone that we should drag into litigation. Thank you so much. Thank you, counsel. The court will take the matter under advisement, issue a decision in due course. The court will take a short recess before we take up the last case of the night.